STATE of Missouri, ex rel., OFFICE OF
THE PUBLIC COUNSEL, Appellant,

v.

PUBLIC SERVICE COMMISSION OF
MISSOURI, et al., Respondent,

United Water Missouri, Inc.,
Intervenor, Respondent.

No. WD 52366.

Missouri Court of Appeals,
Western District.

Submitted Oct. 17, 1996.

· Decided Feb. 11, 1997.

John B. Coffman, Jefferson City, for Appellant Office of the Public Counsel.

James M. Fischer, Jefferson City, for Intervenor Appellant City of Jefferson City, MO.

Eric Witte, for Respondent Public Service Commission.

Sondra B. Morgan, Jefferson City, for Intervenor Respondent United Water Missouri, Inc.

Before SMART, P.J., and SPINDEN and ELLIS, JJ.

SMART, Presiding Judge.

A water utility sought judicial review of the Missouri Public Service Commission's [1] ("the Commission") Report and Order in a utility rate case. The Office of the Public Counsel [2] ("OPC") appeals from the circuit court's judgment affirming the Report and Order of the Commission. OPC contends that the circuit court erroneously affirmed the Commission's decision because the Commission's calculation of the rate impact of United Water Missouri, Inc.'s [3] ("the Company") contract with Public Water District No. 2 ("the District") failed to include certain variable costs incurred by the water company and was, thus, unlawful and unreasonable.

In 1977, the Company needed more storage facilities and a backup source of water. The Company faced two options: building its own storage tanks or leasing storage facilities from the District. On August 23, 1977, the Company entered a contract with the District wherein the Company was permitted to use all of the District's storage tanks and wells in exchange for the Company's agreement (1) to operate and maintain the tanks and wells; (2) to pay $2,000 per month to the District; and (3) to provide the District with all of its water needs. The term of the contract was twenty years. In 1990, the parties executed an addendum to the contract which extended the contract for three years and gave added responsibilities to the Company.

The Company submitted the original contract to the Commission before executing it. The Commission reviewed the contract and stated no objection to its execution. During the subsequent twelve years, the Company filed five rate cases, each resulting in an increase in rates for the Company. Each of these cases was resolved by settlement negotiated by the parties.

On December 15, 1989, the Company filed a rate case requesting $516,477 in additional revenue. This rate case was the first in which the Commission reviewed the ratemaking treatment to be given the contract.

1. The Missouri General Assembly established the Missouri Public Service Commission to regulate utilities. The General Assembly granted the Commission all powers of the Public Service Commission Law, and all powers necessary or proper to enable it to carry out fully and effectually the purposes of that Act. §§ 386.010–.800, RSMo 1994.

2. The Missouri General Assembly established the Office of the Public Counsel to represent and protect the interests of the public in any proceeding before or appeal from the Commission. The General Assembly granted the Office of the Public Counsel all powers necessary or proper to carry out its duties. §§ 386.700–.710, RSMo 1994.

3. United Water Missouri, Inc., formerly known as Capital City Water Co., is a "water corporation" pursuant to § 386.020(51), and thus a "public utility" pursuant to § 386.020(32), subject to the jurisdiction, regulation and control of the Commission.

OPC suggested the rate be reduced by $238,-544, based upon its calculation of the revenue requirement of the Company had the Company built a storage tank in 1977, measured against the revenue requirement resulting from the Company's contract with the District.[4] The Commission found that the contract was imprudent because it did not contain a limit upon the Company's obligation to provide the District's water needs.[5] The Commission granted a rehearing on the issue of what particular adjustment to the Company's revenue requirement should be made as a result of the contract. On June 19, 1991, the Commission found that the proper downward revenue adjustment was $266,009 per year. The Commission further found that it would be inappropriate to allow the Company to fully recover the expense associated with the contract. The Company appealed the Commission's decision and this court affirmed the finding that the contract was imprudent, but remanded the issue of costs associated with the contract to the Commission. *State ex rel. Capital City Water Co. v. Missouri Pub. Serv. Comm'n*, 850 S.W.2d 903 (Mo.App.1993). The parties eventually settled the case.

On March 25, 1994, the Company filed tariffs with the Commission designed to increase the annual water service revenues by $523,606. After an evidentiary hearing, on February 8, 1995, the Commission issued its Report and Order (1) reaffirming the finding that the Company acted imprudently by executing the contract; and (2) finding that no adjustment to revenue was warranted because the benefits associated with the contract during the test year exceeded the costs of the contract during the same period. In concluding that no adjustment needed to be made, the Commission rejected the method it had used to calculate the contract adjustment in the prior rate case, and implemented a new "cost/benefit" method. The Commission rejected the proposed tariffs, but authorized the Company to file tariffs designed to increase gross revenues by $334,799. Both OPC and the Company filed petitions for review in the circuit court. On January 1, 1996, the circuit court affirmed the Report and Order of the Commission. On February 16, 1996, OPC filed its notice of appeal.

On appeal, OPC raises two interrelated points, both alleging that the circuit court erred in affirming the Commission's Report and Order because (1) the order was unlawful and unreasonable in that the Commission's calculation of the rate impact of the Company's contract with the District failed to include certain variable costs incurred by the Company to operate and maintain the wells; and (2) the order is unreasonable in that the "cost/benefit" method used to calculate the rate impact of the Company's contract with the District was implemented in a lopsided manner which recognized the value of well water consumed by the Company's customers as a "benefit" but failed to recognize the corresponding "cost" incurred by the Company to operate and maintain the wells. These points will be considered together.

## Standard of Review

This court reviews the decision of the Commission, not the judgment of the circuit court. *State ex rel. City of St. Joseph v. Public Serv. Comm'n*, 713 S.W.2d 593, 595 (Mo.App.1986). Judicial review of the Commission's order is limited to a determination of whether the order is lawful and reasonable. *State ex rel. City of West Plains v. Public Serv. Comm'n*, 310 S.W.2d 925, 933 (Mo. banc 1958). "[Q]uestions of lawfulness turn on whether the Commission's orders or decisions are statutorily authorized and questions of reasonableness turn on whether there is competent and substantial evidence upon the whole record to support them." *State ex rel. Conner v. Public Serv. Comm'n*, 703 S.W.2d 577, 579 (Mo.App.1986) (quoting *State ex rel. Marco Sales v. Public Serv.*

4. The revenue requirement in the context of rate-setting is the amount of revenue ratepayers must generate to pay the costs of producing the water received by such ratepayers while yielding a reasonable rate of return to investors.

5. Initially, before the parties executed the contract, the Company experts supported leasing the District's facilities only if the contract included an annual cap on the amount of water the Company would be required to provide to satisfy the District's water needs. The contract contained no such cap.

*Comm'n,* 685 S.W.2d 216, 218 (Mo.App.1984). The Commission's order carries with it a presumption of validity. *State ex rel. Missouri Power & Light Co. v. Pub. Serv. Comm'n,* 669 S.W.2d 941, 944 (Mo.App. 1984)). Where a decision of the Commission turns on purely factual issues, this court may not substitute its judgment for that of the Commission if the order is supported by competent and substantial evidence on the record as a whole. *State ex rel. Utility Consumers Council of Missouri, Inc. v. Public Serv. Comm'n,* 585 S.W.2d 41, 47 (Mo. banc 1979). This court is allowed to determine whether, upon consideration of the evidence, the Commission could reasonably have reached the result that it did. *Capital City Water Co.,* 850 S.W.2d at 912. The Commission's decision will be reversed if the action of the Commission was arbitrary, capricious and without reasonable basis. *Id.*

### *"Cost/Benefit" Analysis*

In order to analyze the contract for rate-making purposes, the Commission sought to quantify the benefits and costs that occurred as a result of the existence of the contract during the test year, which in this rate case was 1993. In the Report and Order, the Commission stated:

> If the costs to the Company associated with the existence of the contract exceed the benefits that accrue to the Company, the Commission will make an adjustment to the Company's revenue requirement to compensate the Company's ratepayers for the excessive value transferred by the Company to the District. If, on the other hand, the benefits associated with the existence of the contract exceed the costs associated with the contract, the Commission will make no adjustment.

In order to weigh the benefits of the contract against the costs of the contract, the Commission assigned a value to the water that the Company transferred to the District storage facilities and a value to the water that

the Company received back from the storage facilities. The water which was transferred from the Company to the District storage facilities constituted 100 percent Company-produced water, while the water which was transferred from the District wells to the Company consisted of a mixture of District-treated water from the wells ("District-produced water") and Company-treated water from the Missouri River ("Company-produced water"). The District-produced water cost less to produce than the Company-produced water. Thus, the Commission assigned a different value to each source of water. Furthermore, the Commission assigned a value to the benefit the Company received by not having to build additional storage. The Commission also considered the monthly payment of $2,000 that the Company was obligated to pay to the District pursuant to the contract.

The Commission first calculated the costs to the Company resulting from the contract by quantifying the cost associated with the Company-produced water delivered into the District storage facilities. During the 1993 test year period, the Company delivered 173,610 ccf [6] (129,860,280 gallons) of Company-produced water into the District storage facilities. The Commission calculated the value of Company-produced water to be $1.01 per ccf.[7] Multiplying 173,610 ccf by $1.01 per ccf, the Commission found the value of the Company-produced water transferred to the District storage facilities during the test year to be $175,346. Under the terms of the contract, the Company paid the District an additional $24,000 ($2,000 per month) in 1993. Thus, the Commission found that the total costs associated with the contract equaled $199,346 [$175,346 + $24,000].

Next, the Commission quantified the benefits the Company received as a result of the contract in part by establishing a value for the water received by the Company as a result of the existence of the contract. In

---

**6.** The acronym "ccf" represents one hundred cubic feet. One cubic foot of water is equal to 7.48 gallons of water. Thus, 129,860,280 gallons divided by 748 equals 173,610 ccf.

**7.** To derive the value of $1.01 per ccf, the Commission calculated the total costs incurred by Company if there had been a sale of water from the Company facilities to the District ($1,508,-257) divided by the total ccf of water sold (1,494,737 ccf).

1993, the Company received 229,590 ccf (171,733,320 gallons) of water back from the District's storage facilities. Company-produced water was transferred to the District's storage facilities, the water was mixed with District-produced water, and then was returned to the Company for use by its customers. The Commission determined that 74.05 percent of the water received by the Company from the storage facilities was District-produced water, and 25.95 percent of the water received by the Company from the storage facilities was Company-produced water.[8] The Company received 229,590 ccf (171,733,320 gallons) of water from the District storage facilities, 59,579 ccf of Company-produced water [229,590 × 25.95%], and 170,011 ccf of District-produced water [229,590 × 74.05%].

The value of the District-produced water is $0.34 per ccf.[9] The value of Company-produced water is $1.01 per ccf. Thus, the benefit to the Company associated with water received as a result of the contract is $117,979 [ (59,579 ccf × $1.01) + (170,011 × $0.34) ]. Another benefit received by the Company is a foregone storage expense, since the Company did not have to build additional storage to meet the needs of its growing customer base. OPC offered evidence establishing that the cost to the Company if it had built its own storage tank would have been $119,189. Neither party enlightens us as to how the sum of $119,189 was determined. The Commission found that the total benefit to the Company as a result of the contract during the test year was $237,168 [$117,979 + $119,189]. The following table shows the benefits and costs of the contract as calculated by the Commission for the 1993 test year.

| Benefits | | Costs | |
|---|---|---|---|
| Water Received | $117,979 | Water Tendered | $175,346 |
| Foregone Storage Expense | 119,189 | Fixed Lease Payment | 24,000 |
| TOTAL BENEFITS | $237,168 | TOTAL COSTS | $199,346 |

As a result of utilizing this "cost/benefit" analysis, the Commission found that the benefits associated with the contract during the test year period exceeded the costs associated with the contract. Thus, the Commission found that no adjustment was warranted.

### Variable Costs

■ The Commission's "cost/benefit" analysis recognizes the value of the water pumped from the Company to the District as a "cost" and recognizes the value of the water pumped from the District to the Company as a "benefit." OPC claims that the missing component from the Commission's analysis is the cost of the District well water produced at Company's expense which is used within the District territory itself. The Company is responsible for the cost of operating and maintaining the District wells. OPC argues that the Commission did not consider and properly incorporate the variable costs of operating and maintaining the wells, i.e., electricity, maintenance, chemicals, etc., in its "cost/benefit" analysis as those costs relate to water produced at the District and used in the District. According to OPC, "the Commission focused so closely on the flow of water through the interconnect points between the two service territories that it overlooked the cost of well production incurred by Company pursuant to the District Contract to supply the District's water needs." We disagree.

8. During 1993, 173,610 ccf (129,860,280 gallons) of Company-produced water was mixed with 495,369 ccf (370,536,000 gallons) of District-produced water. Assuming a perfect mixing, 74.05 percent [495,369 ccf ÷ 668,979 ccf] of the water was District-produced water, and 25.95 percent [173,610 ccf ÷ 668,979 ccf] of the water was Company-produced water.

9. This unit cost was derived by taking the fully-allocated cost of the Company to operate and maintain the District's facilities and dividing by the product of the District facilities [$167,512 ÷ 495,369 = $0.34 per ccf].

After reviewing the Report and Order of the Commission, we conclude that the Commission considered the variable costs of water produced in the District's wells for use in the District. The Commission stated in its Report and Order:

> There was evidence proffered in this proceeding about the benefit to the Company of having operational control over the District's facilities and there was evidence offered about the costs to the Company associated with operating and maintaining District facilities. The Commission finds that the costs and benefits arising as a result of the Company's operational control of much of the District's plant are each part and parcel of the same concept (i.e., a transfer of operational control to the Company from the District). The Commission believes that the costs of operating and maintaining District facilities are properly considered exclusively in the calculation of cost per ccf of District-produced water, based on the record before it.

For purposes of its analysis, the Commission found that the benefit of the Company's operational control over the District's facilities offset the costs incurred by the Company associated with operating and maintaining the District facilities. The Commission also discussed some of the shortcomings and problems it found in the OPC's analysis. This portion of the Report and Order provides:

> The Commission finds that OPC's analysis and result are not correct and the policy effect of the analysis is inappropriate. OPC's analysis double-counts several expenses incurred by the Company as a result of its relationship with the District. For example, OPC's analysis shows a direct assignment of $64,703 in purchased power expense. This is the cost of electricity which the Company incurs to pump water from the District's wells into the District's system or tanks. In addition, however, OPC allocates 22.27 percent of the remaining purchased power expense incurred by the Company in operating the Company's treatment plant and distribution system. This results in an allocation of approximately 44 percent of the Company's total electric costs to the District, even though total well production is only 22 percent of total well and treatment plant production.

OPC concedes that the Commission has the lawful discretion to choose a method of calculating the value of the contract and that a "cost/benefit" analysis is not *per se* unreasonable. We conclude that the "cost/benefit" analysis method utilized by the Commission was not an unreasonable method for the Commission to use to determine the rate impact of the contract. The Commission has considerable discretion in rate setting due to the inherent complexities involved in the rate setting process. *State ex rel. Associated Natural Gas Co. v. Public Serv. Comm'n*, 706 S.W.2d 870 (Mo.App.1985). It is not the theory or methodology, but the impact of the rate order which counts. *State ex rel. Missouri Water Co. v. Public Serv. Comm'n*, 308 S.W.2d 704, 714 (Mo.1957). Missouri courts do not set utility rates. *State ex rel. GTE North, Inc. v. Missouri Pub. Serv. Comm'n*, 835 S.W.2d 356, 361 (Mo.App.1992). "If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end." *Associated Natural Gas*, 706 S.W.2d at 873 (quoting *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 602–03, 64 S.Ct. 281, 287–88, 88 L.Ed. 333 (1944)). Where ratemaking is at issue, determinations by the Commission are favored by a presumption of validity. *Missouri Power & Light Co.*, 669 S.W.2d at 944. We conclude that the Commission's order was not unlawful or unreasonable. Points I and II are denied.

Judgment is affirmed.

SPINDEN and ELLIS, JJ., concur.